FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 DEC 19 P 6: 29

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SELECTIVE WAY INS. CO., | * |
| Plaintiff | * |
| v. | * CIVIL NO. JKB-12-3100 |
| NAT'L FIRE INS. CO. OF HARTFORD, | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

### I. Background

Plaintiff Selective Way Insurance Company ("Selective") has sued Defendant National Fire Insurance Company of Hartford ("National Fire") after National Fire denied Selective's insurance claim under a builder's risk policy issued by National Fire for the construction of a new College of Liberal Arts building at Towson University in Maryland. (Compl. ¶¶ 1, 3, 9, ECF No. 1.) Pending before the Court are the parties' cross-motions for summary judgment, which have been thoroughly briefed. (ECF Nos. 26, 27, 28, 29.) No hearing is required. Local Rule 105.6 (D. Md. 2011). Selective's motion will be granted, and National Fire's motion will be denied.

### II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any

genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

When a court is called upon to decide cross-motions for summary judgment, it must review each motion separately on its own merits to decide whether either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Thus, as with any motion for summary judgment, the court must review the facts and reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Id.*

## III. Undisputed Facts

The parties agree that the facts are undisputed. (Pl.'s Mot. Summ. J. 1, ECF No. 26; Def.'s Cross-Mot. Summ. J. Supp. Mem. 27, ECF No. 27.) As National Fire has stated, "The parties do not dispute the circumstances surrounding the incident. Nor do the parties disagree on the policies to be reviewed by this Court. The only dispute is whether the National Fire builder's

2

risk policy is applicable to the loss paid by Selective." (*Id.*) This question of law is best resolved after recitation of some of the underlying facts.

Whiting-Turner Contracting Company ("Whiting-Turner") was selected to be general contractor on the construction of a new building at Towson University ("University").[1] The construction contract between Whiting-Turner and the University required Whiting-Turner to purchase and maintain a builder's risk insurance policy naming as additional insureds not only Whiting-Turner and the University, but also the State of Maryland and "any subcontractor, or anyone directly or indirectly employed by any of them." (Pl.'s Mot. Ex. 1, Contract, section 6.06.A.) Further, the construction contract provided:

> Insurance should be against *all risks of direct physical loss of or damage* to the insured property including theft; earthquake; flood; and settling, shrinkage or expansion of buildings or foundations other than normal settling shrinkage or expansion. Any fault, defect, error or omission exclusion should not apply to damage resulting from such fault, defect, error or omission in the design plans or specifications. *Any faulty or defective workmanship or internal exclusion clause should not apply to damage resulting therefrom.*

(*Id.*, section 6.06.D (emphasis added).)

Accordingly, Whiting-Turner obtained from National Fire a builder's risk policy ("Policy") that named as insureds "all contractors and subcontractors of every tier as their interests may appear at the insured project . . . ." (Pl.'s Mot. Ex. 2, p. 5, Policy, Add'l Named Insured Sched.) Within the Policy, National Fire provided the following general statement of "coverage": "Subject to the Limits of Liability in the Declarations, and all other policy provisions we will pay for direct physical loss or damage to covered property and/or interests described herein from any Covered Cause of Loss." (*Id.* Section A (p. 3 of 28).) Further, the

---

[1] Although the contract was nominally between Whiting-Turner and the University of Maryland, Baltimore, the building to be constructed was located at Towson University. For ease of reference, the owner of the building will be referred to simply as the "University."

3

Policy states, "Covered Causes of Loss means all causes of direct physical loss or damage except those causes of loss listed in Section **B. Exclusions**." (*Id.* Section A.4 (p. 8 of 28).)

Turning to the Exclusions in the Policy, the parties have drawn the Court's attention to certain exclusionary provisions:

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:
>
> . . .
>
> **m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.
>
> **3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> . . .
>
> **b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.
>
> **c.** Faulty, inadequate or defective:
>
> **(1)** Design, specifications, workmanship, processing, manufacture, testing, repair, installation, construction, renovation, remodeling, grading, compaction;
>
> **(2)** Materials used in processing, manufacture, testing, repair, construction, renovation or remodeling;
>
> . . . .
>
> of part or all of any property on or off the premises.

(*Id.* Section B (pp. 20 & 22 of 28).)

One of the subcontractors on the construction project was L.H. Cranston & Sons, Inc. ("Cranston"), who provided mechanical and plumbing work in the new building. (*Id.* Ex. 3, Subcontract.) In the course of its work, Cranston installed a water supply line to a water cooler on the third floor. On or about October 20, 2010, the water supply line leaked, resulting in water

4

damage to the finishes in the building as well as other items of work. (Compl. ¶¶ 15-17; Pl.'s Mot. Ex. 4, Letter Whiting-Turner to Cranston, Oct. 25, 2010.) Cranston filed a claim on its commercial general liability policy with Selective for "water damage to 3 floors from fitting coming loose" and noted that the "fitting from drinking fountain came loose on 3rd floor Building B fountain. Water was discovered this morning and is all over 3rd, 2nd and 1st floor[s]." (Def.'s Mot. Ex. C, Notice of Claim, Oct. 20, 2010.) Selective's claims investigator determined that the cause of the fitting coming loose was either defective manufacture or defective installation (*id.* Ex. E, Noppinger File Notes 19), and Selective later indicated "that the water leak incident and resulting damages flowed directly from the installation of a non-defective plumbing fitting by L.H. Cranston" (*id.*, Ex. G, Pl.'s Ans. Interrog. #11).

Shortly after the filing of the claim, Selective notified Cranston that Selective had agreed to pay Whiting-Turner for repairs related to the damage. (*Id.*, Ex. F, Email Noppinger to Chambers, Nov. 5, 2010.) Thereafter, Selective paid $1.15 million to Whiting-Turner (the Releasor), which released Cranston (the Releasee) and Selective

> from all actions, causes of action, claims, and demands whatsoever, whether or not well-founded in fact or in law, and from all suits, . . . covenants, contracts, controversies, agreements, leases, promises, trespasses, damages, judgments, executions, claims and demands whatsoever, . . . that RELEASOR ever had, now has, or that its . . . insurers . . . may have against RELEASEE, by reason of any matter, cause or thing whatsoever, up to and including the day and date of this Release, arising from and/or in connection with the water damage incident ("the Incident") that occurred on or about October 20, 2010 . . . but saving and excepting . . . b) any subrogation rights, claims and/or defenses RELEASOR has in connection with any subrogation claim made by RELEASEE or its insurers, including Selective Way Insurance Company, under any available Builder's Risk policies on the Project . . . .
>
> . . . RELEASOR reserves the right to pursue any claim it may have against RELEASEE and/or Selective Way Insurance Company to recover any deductible and/or reasonable legal costs or other expenses which must be paid and/or incurred by or on behalf of RELEASOR in connection with any subrogation claim related to the above described loss by RELEASEE or by Selective Way Insurance

5

Company against any policy of insurance held in connection with the Project, including but not limited to Whiting-Turner's Builder's Risk policy on the Project. RELEASEE and Selective Way Insurance Company hereby agree to indemnify, hold harmless, and/or to reimburse RELEASOR upon demand for any deductible and/or reasonable legal costs and expenses that RELEASOR is obligated to pay and/or incurs in connection with any subrogation claim related to the above described loss by RELEASEE or by Selective Way Insurance Company against any policy of insurance held in connection with the Project, including but not limited to RELEASOR'S Builder's Risk policy on the project.

RELEASOR, through the execution of this Release, specifically intends to release and discharge RELEASEE from any and all property damage claims and property damage causes of action . . . arising from and/or in connection with the Incident, subject to the exceptions in the first paragraph of this Release.

(Pl.'s Mot. Ex. 5, Release, Feb. 11, 2011.)[2]

After this settlement occurred, attorneys representing Cranston and Selective asserted a claim on their behalf under the builder's risk policy issued by National Fire for the loss stemming from the October 20, 2010, incident. (*Id.*, Ex. 9, Letter Cassidy to HMS Ins. Assoc., Feb. 21, 2011.) Additional correspondence (*id.*) eventually resulted in a letter of denial from CNA, apparently on behalf of National Fire (*id.*, Ex. 10, Letter Barrick to Cassidy, Jan. 11, 2012).[3] The instant diversity suit was filed by Selective on October 19, 2012. Cranston has assigned its rights under the Policy to Selective in consideration of the latter's indemnification of Cranston. (*Id.*, Ex. 7, Assignment, Jun. 23, 2013.)

*IV. Analysis*

As earlier noted, disposition of this case depends upon whether Cranston, and by assignment, Selective, is entitled to coverage under the National Fire Policy for the water

---

[2] Cranston and Selective were also released by SI Restoration for the sum of $185,000, which represented the cost of SI Restoration's services in the immediate aftermath of the water damage. (Pl.'s Mot. Ex. 6, Release, Jan. 31, 2011.)

[3] The relationship between CNA and National Fire has not been explained to the Court.

damage to the University building. Two essential questions must be answered in the affirmative for the Plaintiff to succeed:

1. Is Cranston an "insured" under the Policy?
2. Is the claimed loss covered by the Policy?

Both parties have based their respective motions on the implicit assumption that Maryland law governs the interpretation of the Policy, and the Court, therefore, relies upon Maryland law for decision. Resolution of the first issue turns on more than simply reading the Policy, which clearly states that Whiting-Turner's subcontractors are insureds. Whether one is insured depends upon whether one has an insurable interest in the property that is the subject of an insurance policy. Md. Code Ann., Ins. § 12-301(b) (LexisNexis 2011) ("A contract of property insurance or a contract of insurance of an interest in or arising from property is enforceable only for the benefit of a person with an insurable interest in the property at the time of the loss."). *See also* 4 Bruner & O'Connor Construction Law § 11:211 ("Builders' risk insurance protects those who have an insurable interest in a building that is under repair, renovation, or construction"; "the parties who might conceivably have 'an insurable interest' in a property under construction are generally much greater in number that is the case with existing structures. Contractors, subcontractors, and materialmen all potentially have an interest in a construction project.").

The pertinent section of the Maryland Code defines "insurable interest" as "an actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance against loss, destruction, or pecuniary damage or impairment to the property." Md. Code Ann., Ins. § 12-301(a). Further, the statute provides, "An insurable interest in property is

measured by the extent of possible harm to the insured from loss, injury, or impairment of the property." § 12-301(c).

It is obvious from these statutory definitions that insurable interest in Maryland property insurance policies is a broad concept, not limited by ownership or possessory rights. Cranston's claimed economic interest is the extinguishment of its liability for the water damage. Given that Selective has placed a value of $1,335,000 on that liability—representing its payments to Whiting-Turner and SI Restoration in connection with the water damage—that amount of money surely amounts to "an actual, lawful, and substantial economic interest," within the meaning of the statute. This view of "insurable interest" has not been expressed by any Maryland case law, but is consistent with decisions based on other states' law. *See, e.g., General Electric v. Zurich-American Ins. Co.*, 952 F. Supp. 18, 21 (D. Me. 1996) (interpreting similar Maine statutory provision; "an insured's interest in being held free from any liability arising out of its involvement in a construction project is indeed a substantial economic interest of the kind referred to in the statute"); *Sherwood Medical Co. v. B.P.S. Guard Servs., Inc.*, 882 S.W.2d 160, 163 (Mo. Ct. App. 1994) (noting broad definition of insurable interest in Missouri case law and concluding subcontractor's interest in remaining free from legal liability fell within builder's risk policy at issue); *Dyson & Co. v. Flood Engineers, Architects, Planners, Inc.*, 523 So. 2d 756, 759 (Fla. Dist. Ct. App. 1988) (interpreting similar Florida statute and concluding architectural and engineering firm "had a substantial interest in being held free from any liability arising out of its participation in the project"); *Bd. of Educ., Jordan Sch. Dist. v. Hales*, 566 P.2d 1246, 1247-48 (Utah 1977) (concluding builder's risk policy included masonry subcontractor as coinsured and covered risk of subcontractor's negligence as peril insured against; denying insurer's asserted right of subrogation against subcontractor); *Baugh-Belarde Constr. Co. v. College Utilities*

*Corp.*, 561 P.2d 1211, 1214 (Alaska 1977) (builder's risk policy "protected each insured party against his own negligence, whether the property lost belonged to him or to some other insured party"; denying insurer's asserted right of subrogation against subcontractor that was found to be "insured" under policy). *See also Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761 (7th Cir. 2013) (noting that under Mississippi law, "'All that is required for one to have an insurable interest in property is that the insured will suffer an economic loss if the property is destroyed" at time of insurance contract formation; former owner had insurable interest); *United Techs. Corp. v. Am. Home Assur. Co.*, 989 F. Supp. 128, 142-43 (D. Conn. 1997) (relying upon Connecticut law and concluding plaintiff's direct liability for cost of environmental remediation gave plaintiff insurable interest under "all risks" policy).

National Fire claims that the *Dyson* holding "was flatly rejected fifteen years later in *U.S. Fire Insurance Company v. Sovran Construction Company, Inc.*" (Def.'s Mot. Supp. Mem. 21), but National Fire misinterprets the *U.S. Fire* case. There, a condominium association had sued the condominium's construction contractor and developers for damages resulting from construction defects and deficiencies in the condominium, a loss that was not claimed until after the association and unit owners had taken over control and occupancy. 854 So.2d 221, 222 (Fla. Dist. Ct. App. 2003). Although the opinion does not state what damage was claimed and whether that suit proceeded to judgment, the implication is that the contractor and developers were held responsible for the construction defects and deficiencies. In turn, the contractor and developers sued U.S. Fire, the issuer of a builder's risk policy, for indemnification. *Id.* In effect, then, the insureds under the policy were seeking to assert the uninsured condominium association's third-party claim for liability against U.S. Fire. A panel of the same appellate court that had decided *Dyson* ruled in U.S. Fire's favor, noting that *Dyson* had involved an insurer's

right to subrogation against a coinsured and, therefore, was distinguishable. *Id.* It reiterated Florida case law that a builder's risk policy is not a liability policy but is a first-party contract that "does not indemnify a third-party, such as a condominium association, for faulty workmanship." *Id.* Such a policy is designed "to provide protection for fortuitous loss *sustained during the construction of the building.*" *Id.* (emphasis added). The *U.S. Fire* holding is consistent with the *Dyson* case, which clearly did involve a fortuitous loss sustained during the construction of the facility in that case, *i.e.*, fire damage occurring during the testing phase of a sewage treatment plant. In no way did the *U.S. Fire* opinion overrule *Dyson* or even suggest that *Dyson* had been abrogated. Thus, *Dyson* continues to stand as good law on the definition of "insurable interest" in Florida under a statute that is remarkably similar to Maryland's statute on the same subject.

National Fire contends that the *Sherwood, Dyson, Jordan School District,* and *Baugh-Belarde* cases are inapposite because they involved the issue of whether a builder's risk carrier may seek subrogation against an additional insured. (Def.'s Mot. Supp. Mem. 21.) However, those cases' outcomes depended upon the definition of "insurable interest," and National Fire offers no convincing argument why this term should be defined differently in the present context of an insured subcontractor's claim on a builder's risk policy. Consistent definition in these different circumstances is not only desirable but logical. In actuality, the instant case's circumstance, denial by the insurer of a claim by an insured, is but the opposite side of the coin of these other cases involving the insurer's asserted claim against the insured.

In a footnote in its reply memorandum, National Fire cites two cases and suggests they should be considered on the issue of "insurable interest," but offers no argument thereon. (Def.'s Reply 3 n.1, ECF No. 29.) Neither case is persuasive. First, National Fire cites the case of *Paul*

*Tishman Co. v. Carney & Del Guidice, Inc.*, 36 A.D.2d 273 (N.Y.S. 1971), *aff'd*, 316 N.E.2d 875 (N.Y. App. Div. 1974). Neither the lower court opinion nor the opinion of the New York Court of Appeals offers any helpful insight into the definition of insurable interest. The lower court majority found it to be a nonissue, 36 A.D.2d at 274, and the higher appellate court confusingly noted, while affirming the lower court, that the subcontractor's insurable interest "was limited to its *property* interest in the building under construction—i.e., the tools, labor and material furnished or owned by the [subcontractor]," 316 N.E.2d at 875 (emphasis added), despite the fact that the applicable New York statute defining insurable interest is worded similarly to the Maryland statute. *See* 36 A.D.2d at 275 (dissenting op., Capozzoli, J.) (citing Section 148 of New York's Insurance Law). The limitation of economic interest only to property interests is an unexplained and illogical interpretation of the statute.

The other case mentioned in passing by National Fire is *Pub. Serv. Co. of Oklahoma v. Black & Veatch, Consulting Eng'rs*, 328 F. Supp. 14 (N.D. Okla. 1971). This opinion also focused on the concept of property ownership in considering the meaning of insurable interest under the insurance policies at issue. *Id.* at 17. Such a narrow interpretation of this term is inconsistent with the "economic interest" formulation present in the Maryland Code.

Another case, while not directly on point as to builder's risk policies, has addressed the meaning of insurable interest and concluded ownership of the property damaged is not the test of insurable interest. Consequently, an innocent purchaser of a stolen automobile was held to have an insurable interest in the car. *Butler v. Farmers Ins. Co. of Arizona*, 616 P.2d 46, 47-48 (Ariz. 1980) (construing Arizona statute similar to Maryland statute; noting that innocent purchaser may, if property is damaged or destroyed, "be held liable in tort for conversion, and therefore has an interest in maintaining the property in an undamaged condition"). *See also Granite State Ins.*

*Co. v. Lowe*, 362 So. 2d 240, 241 (Ala. Civ. App. 1978) (holding same; endorsing "factual expectation" theory of insurable interest as opposed to "legal interest" theory). *Cf. J.J. Altman & Co. v. Illinois*, No. 78-CC-1656, 1984 WL 589452, at *1-2 (Ill. Ct. Cl. Jul. 2, 1984) (finding construction manager had no insurable interest under builder's risk policy because it suffered no loss due to water damage and was not responsible for damage resulting from actions of independent subcontractor); *All Phase Const. Corp. v. Federated Mut. Ins. Co.*, 340 N.E.2d 835, 836 (Ind. App. 1976) (noting insurable interest customarily embraces liability to loss from damage; holding subcontractor was insured under property insurance policy); *Am. & Foreign Ins. Co. v. Allied Plumbing & Heating Co.*, 194 N.W.2d 158, 161 (Mich. App. 1971) (finding contractor and subcontractor had insurable interests in building under construction pursuant to builder's risk policy despite absence of immediate, out-of-pocket expenses flowing from fire damage).

The conclusion reached here is that Maryland's definition of insurable interest is not bound by notions of ownership but is a broad concept that favors insurance coverage. This view is consistent with principles of statutory construction that have been enunciated by Maryland courts. In particular, Maryland case law directs a court to ascertain and effectuate the intent of the legislature, beginning "with the plain language of the statute, and ordinary, popular understanding of the English language" to interpret the statute. *Kushell v. Dep't of Natural Resources*, 870 A.2d 186, 193 (Md. 2005). Unquestionably, "actual, lawful, and substantial economic interest" is justifiably interpreted as broader than an ownership interest, and if the Maryland legislature had intended to restrict one's insurable interest to an ownership interest, then it would have used different language from that chosen. Further, the Policy did not define "insured" or an insured's "interest" in a restrictive way; consequently, the Court utilizes those

terms as they have been defined in Maryland law. Therefore, in answer to the first question posed, the Court holds that Cranston (and by extension, Cranston's assignee, Selective) had under the Policy an insurable interest and, further, was an insured who is entitled to assert a first-party claim against the insurer, National Fire.

The second question to be answered is whether the Policy covered the loss resulting from the water damage. Preliminarily, the Court notes that although National Fire has asserted the applicability of three exclusionary provisions—2.m, 3.b, and 3.c—it has failed to provide evidence or supporting argument on the applicability of 2.m and 3.b. Even so, the Court concludes that neither 2.m nor 3.b fits the circumstances in the instant case. Consequently, the only exclusion considered by the Court is 3.c, the one that excludes loss caused by, *inter alia*, faulty workmanship and installation.

In considering the question of coverage under the Policy, the Court presumes that the fitting to the water fountain came loose because of faulty installation by Cranston. But the exclusion for faulty installation does not, by the terms of the policy, exclude the water damage that resulted from the faulty installation. The "ensuing loss" clause in the Policy, section B, paragraph 3, operates to ensure coverage for damage from a covered cause of loss that results from an excluded cause of loss. Insurance coverage under an ensuing loss clause is well recognized in Maryland case law. In *Transatlantic Fire Ins. Co. of Hamburg, Germany v. Dorsey*, 56 Md. 70, 1881 WL 7370 (1881), the Maryland Court of Appeals distinguished between damage caused by explosion and damage caused by fire resulting from the explosion and determined that, while the former was excluded by the policy at issue in the case, the latter would be covered. 1881 WL 7370, at *5. Thus, the court noted, "[T]he exception of liability for explosions of any kind, is certainly very broad and comprehensive; but that exception must not

be so construed as to defeat the main and principal object of insurance." *Id. See also McEvoy v. Sec. Fire Ins. Co. of Baltimore*, 73 A. 157, 160 (Md. 1909) (concluding that ensuing loss clause covered fire damage resulting from earthquake even though earthquake-caused damage was excluded), *cited in Carney v. Assurance Co. of Am.*, Civ. No. JFM-04-3434, 2005 WL 899843, at *2 n.4 (D. Md. Apr. 19, 2005).

The distinction recognized in *Dorsey* and *McEvoy* is consistent with insurance principles stated in treatises. "Ensuing loss clauses act as exceptions to property insurance exclusions and operate to provide coverage when, as a result of an excluded peril, a covered peril arises and causes damage." 2 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 21.04[g], at 1699 (16th ed. 2013).

> The "faulty workmanship" or "faulty design" exclusion is often drafted in such a way that loss or damage in the form of the faulty work itself is excluded, but coverage is afforded for "physical loss or damage resulting from such faulty work." . . . Generally speaking, an ensuing loss provision does not cover loss directly caused by the excluded peril (i.e., repair of the faulty work), but rather covers loss caused to other property wholly separate from the defective property itself.

4 Bruner & O'Connor Construction Law § 11:211.

Coverage for water damage—a covered cause of loss—resulting from faulty workmanship or installation—an excluded cause of loss—is a logical interpretation of the ensuing loss provision in the Policy. Furthermore, it is consistent with the contract between Whiting-Turner and the University, which specified the extent of coverage to be provided in the builder's risk policy:

> Insurance should be against *all risks of direct physical loss of or damage* to the insured property including theft; earthquake; flood; and settling, shrinkage or expansion of buildings or foundations other than normal settling shrinkage or expansion. Any fault, defect, error or omission exclusion should not apply to damage resulting from such fault, defect, error or omission in the design plans or

14

> specifications. *Any faulty or defective workmanship or internal exclusion clause should not apply to damage resulting therefrom.*

(Pl.'s Mot. Ex. 1, Contract, section 6.06.D (emphasis added).)

In a recent case, the U.S. District Court for the Northern District of Florida had occasion to interpret three builder's risk policies, one of them having identical wording and the other two having similar wording in the ensuing loss clause to that used in the Policy before this Court. Water damage resulted from faulty workmanship, and the court held that the damage was covered because of the ensuing loss provision. *Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F. Supp. 2d 1229, 1235 (N.D. Fla. 2012) (construing Florida law). The *Bartram* opinion is directly on point with the interpretation of the Policy here. National Fire seeks to distinguish it by arguing that the insured there was the owner, unlike Cranston/Selective, but this argument goes to the first issue of insurable interest, which has already been found to exist not based on ownership but based on economic interest. The outcome of the *Bartram* case did not depend on any purported distinction between ownership interests and other kinds of insurable interests.

National Fire argues that the water damage is not covered by the Policy because the Policy does not provide coverage for negligence. (Def.'s Mot. Supp. Mem. 17.) Generally, National Fire's argument relies upon the notion that this is a third-party liability suit, which it is not. Instead, this is, as noted earlier, a first-party claim directly by an insured against an insurer. The loss at issue is the water damage, and the policy unequivocally covers water damage, regardless of whether it results from negligence or some other cause. This point was emphasized in the case of *Brodsky v. Princemont Constr. Co.*, 354 A.2d 440 (Md. Ct. Spec. App. 1976), in which the Maryland Court of Special Appeals responded to a similar argument disputing coverage under a property insurance policy for fire damage resulting from a contractor's negligence:

> Appellants assert that the policy did not cover Princemont's negligence. This seems to be irrelevant. Fire insurance covers the property loss sustained, regardless, generally speaking, of its cause. Insurance against negligence indemnifies the negligent person as to his liability to another.

*Id.* at 443. Properly cast, the instant Policy's coverage is for damage to the subject property directly caused by a covered loss, not to indemnify a third party for damage to the third party's property caused by an insured tortfeasor. The focus in this first-party claim is loss to insured property, not whether someone else ought to be held liable for that loss. *See Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 735 A.2d 1081, 1090 (Md. 1999) ("In essence, 'first party coverage' is 'a promise by the insurer to pay its own insured, rather than a promise to its insured to pay some third party.'" (citation omitted)).

Moreover, Maryland cases have been clear that interpretation of an insurance contract is not dependent upon principles of tort law. "[W]e bear in mind the distinction between causes of loss for which liability may be imposed upon an insured by law, and causes of loss for which the insurer may have contracted to be liable." *Aragona v. St. Paul Fire and Marine Ins. Co.*, 378 A.2d 1346, 1349 (Md. 1977) (construing exclusionary clause in legal malpractice policy). *See also No. Assurance Co. of Am. v. EDP Floors, Inc.*, 533 A.2d 682, 689 (Md. 1987) (declining to interpret insurance policy exclusion according to principles of proximate or concurrent cause). Consequently, it is inappropriate to determine whether Cranston has coverage under the Policy by referring to principles of causation in tort law. Instead, the Policy is interpreted according to its terms. *Aragona*, 378 A.2d at 1351.

National Fire has cited another case, *Carney v. Assur. Co. of Am.*, 177 F. App'x 282 (4th Cir. 2006) (unpublished), *aff'g* Civ. No. JFM-04-3434, 2005 WL 899843 (D. Md. Apr. 19, 2005), that it believes bolsters its denial of coverage. However, the facts in *Carney* are readily distinguishable from those now before this Court. In *Carney*, the plaintiffs contracted for the

16

construction of a new home, and a builder's risk policy was issued by the defendant for that construction. Wood siding was allegedly improperly treated with preservative before its installation on the home, and plaintiffs filed a claim under the policy for the damaged siding. The policy excluded damage caused by faulty workmanship and the district court held that the damage claimed fell squarely within the policy's exclusion. 2005 WL 899843, at *1. The Fourth Circuit affirmed and further concluded that the plaintiffs had failed to proffer evidence supporting a finding that the damage fell within an exception to the exclusion for losses caused by an intervening covered cause of loss. 177 F. App'x at 283. Plainly, the damage claimed in *Carney* was for repair of the property directly damaged by faulty workmanship. In the instant case, no claim has been made for repair of the faulty fitting on the water cooler line. Rather, the claim is for the water damage resulting from the failure of the faultily installed fitting. Thus, the damage is a step removed from the faulty workmanship and was not directly caused by it. *Carney* is of no help to National Fire.

National Fire cites another case to support its argument. In this somewhat similar case in this Court, Selective sued National Fire and others for denial of a claim under a builder's risk policy. *Selective Way Ins. Co. v. CNA Ins.*, Civ. No. GLR-11-1732 (D. Md.). There, Whiting-Turner was the general contractor for an addition to a building for the University of Maryland, Baltimore. A masonry subcontractor failed to cover an uninterruptible power unit when the subcontractor was working nearby with a wet saw; as a result, water from the masonry cut leaked into the unit and caused damage. Acting under a commercial general liability policy, Selective indemnified its insured, the subcontractor, for its liability to Whiting-Turner and then, after the subcontractor assigned its rights to Selective, sought reimbursement under the builder's risk policy. Judge Russell held that because the subcontractor was negligent, Selective was not

17

entitled to coverage based upon the exclusions in 2.m and 3.c. (11-1732 Mem. Op., Jul. 15, 2013, at 6-8, ECF No. 69.) Judge Russell did not address the applicability of the ensuing loss clause, which controls the outcome of the instant case. As a result, the undersigned does not find the opinion in that case to be persuasive as to disposition of this case.[4]

National Fire has also advanced an argument that Selective's rights as assignee cannot rise any higher than Cranston's rights as against National Fire. (Def.'s Mot. Supp. Mem. 24.) As a general proposition, this is undisputable, and Selective concedes the point. (Pl.'s Opp. 12.) However, National Fire goes on to argue that any rights Cranston has under the Policy arise out of Cranston's subcontract with Whiting-Turner and that, because in the subcontract Cranston agreed to hold Whiting-Turner and the University harmless from any claims, damages, losses, etc., arising from Cranston's acts or omissions, Cranston has no right to pursue a claim against Whiting-Turner's insurance carriers. (Def.'s Mot. Supp. Mem. 24-25.) The latter conclusion does not logically follow the former premises.

The subcontract certainly led to Cranston's becoming an insured under the Policy. But the Policy at issue is an independent contract that must be interpreted according to its own terms. Therefore, whether Cranston has a sustainable claim under the Policy is not governed by what it agreed to do or not do with Whiting-Turner in the subcontract. Interestingly, National Fire attempts to bootstrap itself into the subcontract's hold-harmless clause by claiming it covered Whiting-Turner's insurance carriers, but the clause did not do so. Nor is it correct for National Fire to refer to itself as Whiting-Turner's carrier, implying that only Whiting-Turner was the insured, when instead it was the carrier for the Policy that also insured Cranston. Finally, this lawsuit is not one against Whiting-Turner for breach of contract for failure to submit the claim to National Fire. (*See* Def.'s Reply 8.) Whiting-Turner is not even in the case. National Fire is not

---

[4] Judge Russell also did not resolve the issue of insurable interest. *See id.* at 7.

18

relieved of its duty of coverage by virtue of anything in the subcontract between Cranston and Whiting-Turner.

One final matter must be addressed. In its motion for summary judgment, Selective requested not only judgment in its favor and costs but also prejudgment interest. Costs will be awarded as a matter of right, but the Court notes that prejudgment interest was not included in Selective's prayer for relief and, further, no briefing was submitted to the Court on this point as to entitlement thereto or computation thereof. Thus, the Court will decline to award prejudgment interest.

## V. Conclusion

The Court concludes that Cranston was an insured party under the Builder's Risk Policy issued by National Fire for the construction of the building for the University. By assignment, Selective is entitled to pursue Cranston's claim under the Policy. Further, the Court concludes that the damage to the building from the water intrusion resulting from Cranston's faulty installation of a fitting on a water line is a covered loss due to the applicability of the ensuing loss clause of 3.c in the Policy. Therefore, National Fire's denial of the claim was in error. Consequently, Selective is entitled to judgment as a matter of law. A separate order will issue.

DATED this __18__ day of December, 2013.

BY THE COURT:

_/s/ James K. Bredar_
James K. Bredar
United States District Judge

19